FILED
2010 Jul-28  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **FLOYD JONES, JR., as the** | ) | |
| **personal representative of the** | ) | |
| **Estate of TRAVORIS HOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-1294-NE** |
| | ) | |
| **CITY OF DECATUR,** | ) | |
| **ALABAMA, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This is a civil rights action brought under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 by Floyd Jones, Jr., the personal representative of the estate of Travoris Hood, deceased, who committed suicide on June 28, 2007, while incarcerated as a pre-trial detainee in the municipal jail of the City of Decatur, Alabama.  The case is before the court on three motions to dismiss plaintiff's complaint: the first filed by the defendant City of Decatur (doc. no. 22); the second filed by defendants Kenneth Collier, Joel Gilliam, Christopher Matthews, and Michael Harvey (doc. no. 24); and the third filed by defendants Michael Harvey, Vernon Davis, Sharon Latham, and Eric Brown (doc. no. 26).

# I.  LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).[1]  This rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).[2]  While that

---

[1] In full text, Rule 12(b) provides that:

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, the adverse party may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b).

[2] With few exceptions (fraud claims being one, *see* Fed. R. Civ. P. (9)(b)), there are only three requirements for pleading a claim in a federal action: "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . ., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). Further, as the First Circuit observed in *Gorski v. New Hampshire Dept. of Corrections*, 290 F.3d 466 (1st Cir. 2002):

pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp.*

*v. Twombly*, 544 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. —, 129

S. Ct. 1937, 1949 (2009) (citations omitted).

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.

> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

---

> There are two other provisions of Rule 8 that are pertinent: "Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading are required." Fed. R. Civ. P. 8(e)(1); and "All pleadings shall be so construed as to do substantial justice." Fed. R. Civ. P. 8(f).

*Gorski*, 290 F.3d at 473 n.5. Moreover, as the Eleventh Circuit observed in *Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364 (11th Cir. 1997):

> The purpose of a Rule 12(b)(6) motion is to test the facial sufficiency of the statement of [a plaintiff's] claim for relief. It is read alongside Fed.R.Civ.P. 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto. . . .

*Brooks*, 116 F.3d at 1368-69 (citation omitted); *see also Conley v. Gibson*, 355 U.S. 41, 47-48 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

that the defendant is liable for the misconduct alleged.  *Id*., at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ibid*.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id*., at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*.  *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id*., at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id*., at 556.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  490 F.3d, at 157-158.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations.  *When there are well-pleaded factual allegations*, *a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Ashcroft v. Iqbal*, 556 U.S. at —, 129 S. Ct. at 1949-50 (emphasis added).

Such pleading standards may be heightened, however, with respect to some claims based upon 42 U.S.C. § 1983. When determining whether increased specificity is required, a distinction first must be drawn between the pleading requirements for § 1983 claims asserted against, on the one hand, *state or municipal governmental entities* and, on the other hand, *individual governmental officials* sued personally, "in their individual capacities." With regard to the former category of claims, the Supreme Court has held that a court may not impose a pleading requirement that is "more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure" to § 1983 claims asserted against municipal governmental *entities*. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). The *Leatherman* Court instructed federal courts to use the mechanisms of summary judgment and discovery to "weed out unmeritorious claims" against municipalities, and affirmed that notice pleading is all that is required for claims of *municipal liability* under § 1983. *Id*. at 168.[3]

On the other hand, the *Leatherman* Court specifically declined to extend its holding to claims against *individual governmental officials*. *See id.* at 166-67 ("We thus have no occasion to consider whether our qualified immunity jurisprudence

---

[3] Even so, a plaintiff must at least put the municipality *on notice* of the particular custom or policy that is alleged to have caused the plaintiff's injury. *See Leatherman*, 507 U.S. at 168.

would require a heightened pleading in cases involving individual government officials."). The Court's subsequent decision in *Crawford-El v. Britton,* 523 U.S. 574 (1998), also did not make that extension. Instead, the *Crawford-El* opinion reaffirmed the Court's refusal to "revise established rules that are separate from the qualified immunity defense," including "requiring pleadings of heightened specificity *in cases alleging municipal liability*," *id.* at 595 (citing *Leatherman,* 507 U.S. at 164-69) (emphasis supplied), and did not discuss the pleading requirements for cases involving the personal liability of *individual government officials*.[4]

Thus, because *Leatherman* and *Crawford-El* do not require a contrary result, "the heightened pleading requirement [remains] the law of this circuit" with regard to a plaintiff's § 1983 claims against individual governmental actors. *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1368 (11th Cir. 1998). *See also, e.g., Gonzalez v. Reno,* 325 F.3d 1228, 1235 (11th Cir. 2003) ("In examining the factual allegations in the complaint, we must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity."); *Dalrymple v. Reno,* 334 F.3d 991, 996 (11th Cir. 2003) (same);

---

[4] *See also Swierkiewicz v. Sorema,* 534 U.S. 506 (2002), holding in the context of a suit brought under Title VII of the Civil Rights Act of 1967, and the Age Discrimination in Employment Act of 1967, that "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits." *Swierkiewicz,* 534 U.S. at 515. That holding has no bearing on a claim against an individual government official pursuant to 42 U.S.C. § 1983.

*Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992) ("[W]e want to use this opportunity to repeat that, 'in an effort to eliminate nonmeritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims, we, and other courts, have tightened the application of Rule 8 to § 1983 cases.'") (quoting *Arnold v. Board of Education of Escambia County*, 880 F.2d 305, 309 (11th Cir. 1989)).

In *Gonzalez v. Reno*, 325 F.3d at 1235, the Eleventh Circuit discussed the heightened pleading requirement in the following manner:

> In examining the factual allegations in the complaint, we must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity. *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1367 (11th Cir.1998). The complaint must allege the relevant facts "with some specificity." *Id*. "[M]ore than mere conclusory notice pleading is required. . . . [A] complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984). *See also Veney v. Hogan*, 70 F.3d 917, 922 (6th Cir. 1995) (holding that complaint must "include the specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity"). Moreover, in reviewing a motion to dismiss, we need only accept "well-pleaded facts" and "reasonable inferences drawn from those facts." *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Marsh v. Butler County*, 268 F.3d 1014, 1036 n. 16 (11th Cir.2001). We must also keep in mind the fact that "[w]e generally accord . . . official conduct a presumption of legitimacy." *United States Dep't of State v. Ray*, 502 U.S. 164, 179, 112 S. Ct. 541, 550, 116 L. Ed.

2d 526 (1991).

*Id.*

## II.  SUMMARY OF RELEVANT FACTS[5]

Travoris Hood ("Hood") was a twenty-seven-year-old black male who had a long history of arrests by Decatur police officers.[6]  He was last arrested by Decatur police on June 23, 2007, on a warrant for domestic violence in the third degree and two bond revocation warrants.[7]  He was placed in the City Jail, where he had a history of behavioral problems during previous incarcerations.[8]

Hood was booked into the jail at 8:35 p.m. on June 23, 2007.[9]  Following the booking process, Corporal Tina Scott completed a medical intake report and initial classification listing for Hood.  In order to complete the report and classification, Scott was required to assess Hood's medical and mental status by following a medical intake checklist.[10]  Eleven of the thirty-eight questions on the medical intake checklist dealt specifically with suicidal ideation.[11]  When Scott asked Hood questions regarding his

---

[5] The following facts are taken exclusively from the allegations of fact contained in plaintiff's complaint (doc. no. 1).

[6] Doc. no. 1, ¶ 15.

[7] *Id.*

[8] *Id.*

[9] *Id.*, ¶ 16.

[10] *Id.*

[11] *Id.*, ¶ 17.

medical and mental status, however, he was combative and refused to respond.[12]  Even

so, Scott determined, based on her observations during the interview, that Mr. Hood

did not pose a risk of harm to himself or others.[13]

Due to Hood's combative behavior, he was initially placed in a one-man cell.[14]

After he calmed down, Hood was transferred to "North Block," a multiple-occupancy

cell that housed twenty-four other inmates.[15]  Each cell in the jail was equipped with

video surveillance cameras.[16]  As a result, jailers could observe activities in a given

cell by looking at sixteen video screens contained on a bank of monitors in the jail's

booking area.[17]  The surveillance video images were recorded, and could be played

back at any time.[18]

At 12:41 a.m. on June 28, 2007, five days after Hood was booked into the city

jail, there was a disturbance in North Block which was recorded by the video

surveillance system.[19]  Corporal Tina Scott was on duty for the night shift at the time

of the disturbance, and when she played back the video of the incident, she observed

---

[12]Doc. no. 1, ¶ 17.

[13] *Id.*

[14] *Id.*, ¶ 18.

[15] *Id.*

[16] *Id.*, ¶ 19.

[17] *Id.*

[18] Doc. no. 1, ¶ 19.

[19] *Id.*, ¶ 20.

Hood jumping on and punching another inmate.[20]   Scott made a report of the incident.[21]

The next shift began at 6:00 a.m. on June 28, 2007.[22]   Lieutenant Christopher Matthews, the Jail Administrator, was responsible for jail operations on that date.[23] His office was not located at the jail, however, and he did not continuously monitor or supervise the activities of jail staff.[24]   Four jailers, including the Jail Supervisor, Sergeant Michael Harvey, worked the day shift from 6:00 a.m. to 6:00 p.m.[25]   Sergeant Harvey's office was located inside the jail.   In addition to Sergeant Harvery, three jailers, Officers Sharon Latham, Eric Brown, and Vernon Davis, were on duty on June 28, 2007.[26]   Sharon Latham was the senior officer and, therefore, supervised the activities of the two junior officers.[27]

Sergeant Harvey arrived at work at 6:00 a.m. on June 28th and, after reviewing the report of the incident from the night shift, ordered that Hood be removed from the general population and placed in Male Cell 3, one of the jail's three-man cells.[28]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*, ¶ 21.

[23] Doc. no. 1, ¶ 22.

[24] *Id.*

[25] *Id.*, ¶ 23.

[26] *Id.*

[27] *Id.*

[28] *Id.*, ¶ 24.

However, Sergeant Harvey did not order the white inmate with whom Hood had been fighting to be taken out of the general population.[29]

Pursuant to Sergeant Harvey's directive, Officers Eric Brown and Vernon Davis took Hood out of the general population at 7:19 a.m. and moved him to Male Cell 3.[30] There were two other inmates in that cell when Hood was transferred. However, one of the inmates was removed shortly thereafter, at 7:26 a.m.[31] The remaining inmate, William Swoopes ("Swoopes"), was a 22-year-old black male.[32]

During the course of being transferred, Hood allegedly became incensed about being removed from general population while the white male with whom he had been fighting was allowed to remain.[33] As soon as Officers Brown and Davis placed him in Male Cell 3, Hood began kicking and beating the door, as well as screaming, yelling, and cursing.[34] He kept repeating that the jailers had left the "white boy" in general population, and accused them of being racists and treating him differently from the white inmate.[35]

---

[29] Doc. no. 1, ¶ 24.

[30] *Id.*, ¶ 25.

[31] *Id.*

[32] *Id.*

[33] *Id.*, ¶ 26.

[34] *Id.*

[35] Doc. no. 1, ¶ 26.

Hood continued his verbal outbursts and began crying.[36]  He repeatedly yelled that he was "tired of this stuff," and that he would commit suicide if he had to stay in the smaller cell.[37]  He continued to call the jailers racists.[38]  He specifically threatened to kill himself if he was allowed to remain in the smaller cell "for at least an hour and a half."[39]  Swoopes tried to calm him, but Hood would not listen.[40]  He was crying and talking about his daughter.[41]  Hood told Swoopes that he had written a letter to the judge in an effort to obtain a bond reduction, in order to be released from jail, and stated repeatedly that he would kill himself if he had to stay in that cell.[42]

Officer Davis also attempted to calm Hood, but he would not listen and remained highly agitated.[43]  Hood told Davis repeatedly that the jailers were racists, that he was being treated differently, that he was tired of being treated unfairly, and that he would commit suicide if he had to remain in the smaller cell.[44]

After Hood failed to comply with the jailers' instructions to calm down, a

---

[36] *Id.*, ¶ 27.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*, ¶ 28.

[41] Doc. no. 1, ¶ 29.

[42] *Id.*

[43] *Id.*, ¶ 30.

[44] *Id.*

restraint chair was brought to his cell at 8:11 a.m., and he was strapped into it.[45]  Even after being placed in restraints, Hood continued to yell.[46]  Among other things, he stated that the jailers were racists, that he wasn't going to eat anything, and that he would commit suicide if he was not moved from the smaller cell.[47]

Officers Brown and Davis were instructed by Officer Latham that they should check on Hood's condition every fifteen minutes.[48]  On each occasion that Davis checked on him, Hood again said that his treatment was due to his race, and that he would kill himself rather than put up with it.[49]  Davis told Hood that the best thing he could do was to calm down, and that he would be released from the restraint chair if he did so.[50]

Hood asked to speak with Sergeant Harvey, who walked to Hood's cell.[51]  Hood told Harvey, among other things, that he was being treated unfairly, and that he would commit suicide if he had to stay in the smaller cell.[52]  After speaking with Hood, Sergeant Harvey left to Officer Latham the decision of how long Hood was to remain

---

[45] *Id.*, ¶ 31.

[46] *Id.*, ¶ 32.

[47] Doc. no. 1, ¶ 32

[48] *Id.*, ¶ 33.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*, ¶ 34.

in the restraint chair.[53]

Hood allegedly calmed down after approximately thirty to forty-five minutes, but remained in the restraint chair for at least another one and a half hours.[54]   Hood was allegedly released from the chair at 10:26 a.m., after two hours and fifteen minutes of restraint.[55]

At 11:15 a.m., Officer Brown went to Hood's cell to deliver lunch to him.[56] Hood allegedly refused the lunch.[57]   Brown contacted Latham by radio and informed her that Hood had refused his lunch.[58]

At 12:18 p.m., Hood began removing the sheet from the top bunk of the over-under bed unit in his cell.[59]   He twisted the sheet to make a rope, tied the sheet to the bars of the cell, stood on the bunk, and placed the sheet around his neck.[60]   At 12:25, Hood stepped off the bunk.[61]   By 12:27, there was no more movement by Hood.[62] Hood's body was discovered hanging from the bars in his cell at 1:33 p.m., by Officer

---

[53] Doc. no. 1, ¶ 34.

[54] *Id.*, ¶ 35.

[55] *Id.*

[56] *Id.*, ¶ 36

[57] *Id.*

[58] Id., ¶ 37.

[59] Doc. no. 1, ¶ 37.

[60] *Id.*

[61] *Id.*

[62] *Id.*

Brown.[63]

During the three hour period from 10:26 a.m. until Hood's body was discovered at 1:33 p.m., the other inmate in Male Cell 3, William Swoopes, allegedly had been lying on the bottom bunk of the over-under bed unit with a blanket pulled over his head.[64] Swoopes allegedly was asleep during this time, and did not awake until the jailers came into the cell after the discovery of Hood's body.[65]

Even though, as previously discussed, the jail was equipped with video surveillance, and the jailers had access to live footage of Hood's cell, none of the jailers on duty allegedly observed the events that led to Hood's death.[66] Officer Davis was the jailer who was sitting at the monitor desk during the relevant time period, and he allegedly did not see any of the events that occurred.[67]

The complaint filed by Floyd Jones as a personal representative of the estate of Travoris Hood asserts claims against the City of Decatur and seven individuals. With regard to the claims against the City, plaintiff alleges that, because of the obvious dangers inherent in the City's repeated failures, year after year, to provide funding to adequately train jail personnel and to adequately staff the jail, the City was

---

[63] *Id.*

[64] *Id.*, ¶ 38.

[65] Doc. no. 1, ¶ 38.

[66] *Id.*

[67] *Id.*

15

deliberately indifferent to the rights of inmates to the protections which would be afforded them by adequately trained jail personnel.[68]

In addition, plaintiff's complaint asserts official capacity and individual capacity claims against seven individual defendants including:  Kenneth Collier, who became the City of Decatur's acting Chief of Police in January 2007, and who was named permanent Chief in March 2007;  Joel Gilliam, who was the City's Chief of Police until his retirement in January 2007;  Christopher Matthews, a Lieutenant in the City police department who was directly responsible for the operation of the jail;  Michael Harvey, the police sergeant stationed inside the jail; and Officers Sharon Latham, Eric Brown, and Vernon Davis, each of whom was working as a jailer at the jail on the day of Hood's suicide.[69]

## III.  DISCUSSION

### A.    Claims Against the City of Decatur

#### 1.    Plaintiff's claim under 42 U.S.C. § 1983

The Eleventh Circuit has noted that the "Supreme Court has placed strict limitations on municipal liability under Section 1983."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  There are only "limited circumstances in which an

---

[68] *Id.*, ¶¶ 88-95.

[69] *Id.*, ¶¶ 9-13.

16

allegation of 'failure to train' can be the basis of liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  Those limited circumstances occur only where the municipality inadequately trains and supervises employees, the failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.  *Gold*, 151 F.2d at 1350.

> The Supreme Court has held that
>
> only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly though of as a city "policy or custom" that is actionable under § 1983. . . . "Municipal liability under § 1983 attaches where — and only where— a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers.

*City of Canton*, 489 U.S. at  389 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986) (plurality opinion)).  In order to establish "deliberate indifference," a plaintiff must present some evidence that the municipality knew of the need to train and/or supervise in a particular area, and the municipality made a deliberate choice not to take any action.  *Gold*, 151 F.3d at 1350.

The Eleventh Circuit has repeatedly held that, "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise."  *Id.* at 1351.  To prove such notice, a § 1983 plaintiff must show a "history of widespread prior abuse" before a policymaker can be "put on

17

notice of the need for improved training or supervision." *Id.* (quoting *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990)). "The deprivations that constitute widespread abuse sufficient to notify the supervising official[s] must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008). *See Church v. City of Huntsville*, 30 F.3d 1332, 1342-46 (11th Cir. 1994) (preliminary injunction reversed because plaintiffs were not likely to succeed on the merits of a failure to train claim without proof that the City was aware of a prior incident in which constitutional rights were violated); *Popham v. City of Talladega*, 908 F.2d 1561, 1654-65 (11th Cir. 1990) (finding no liability in jail suicide case for failure to train where no pattern of incidents put the City on notice of a need to train).

In jail suicide cases specifically, "to prevail under section 1983 for violation of substantive rights, under . . . the . . . Fourteenth Amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking his own life." *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir.1989) (ellipsis in original). Deliberate indifference requires that the defendant deliberately disregard "a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Id.*

The Eleventh Circuit has made clear that there must be a long history of many

18

suicides in a jail before policymakers can be placed on notice that additional funding or new or different training or staffing was required. *See Cagle*, 334 F.3d at 988-89. In *Cagle*, the Eleventh Circuit reviewed a case in which the plaintiff had sought to hold Winston County liable for a suicide on a theory of inadequate funding of the county jail by failing to hire a second, nighttime jailer. *Id.* The *Cagle* Court held that there was no evidence that the County was aware of any "strong likelihood of suicide." *Id.* at 988. The Court noted that, "before the [inmate's suicide, no] prisoner had ever committed suicide in Winston County Jail" and, consequently, "nothing in the record required County officials to conclude that . . . prisoners in the Winston County Jail were substantially likely to attempt suicide." *Id.* at 987. The Court held that, because there were no facts that showed that "the County was truly aware that prisoners in the Winston County Jail were likely to attempt suicide, . . . [t]he County's decision to fund no additional nighttime watcher was not deliberately indifferent to a substantial likelihood of detainee suicide." *Id.* at 988.

As in *Cagle*, there is no evidence showing that the City of Decatur was aware that prisoners in its municipal jail were likely to attempt suicide. Plaintiff makes no allegation in the complaint that any suicides occurred in the city jail prior to the one at issue here. Plaintiff argues, nevertheless, that he need not show any prior instances

of suicide in order to prevail on his § 1983 claim.[70]  In support of that argument, plaintiff cites the *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), in which the Supreme Court recognized that the failure to train can create liability under § 1983 without a history of constitutional violations when the need for training is "obvious."[71] Even so, the Supreme Court also has noted that the situations in which  the need to train is "obvious" are limited to "a narrow range of circumstances."  *Board of County Commissioners v. Brown*, 520 U.S. 397, 409 (1997).  To date, the Supreme Court has noted only one example of a need to train that is so "obvious" as to not require proof of prior constitutional violations:  *i.e.*, the use of deadly force where firearms are provided to police officers.  *Id.* at n.10.

Defendant argues, and this court agrees, that the need for additional training or staffing to prevent jail suicides falls short of the kind of "obvious" need for training that would support a finding of deliberate indifference to constitutional rights on the part of the City.[72]  A lack of suicide prevention training is more akin to the areas where a need to train has been held to be *not* so obvious as to preclude the necessity of proof of a pattern of prior constitutional violations.  *See, e.g., City of Canton*, 489 U.S. at 396-97 (no obvious need for police officers to be trained in diagnosing mental

---

[70] *See* doc. no. 33 (Plaintiff's Response to Motion to Dismiss filed by City of Decatur), at 6-8.

[71] *Id.*

[72] *See* doc. no. 40 (City of Decatur's Reply Brief in Support of Motion to Dismiss) , at 8.

20

illnesses of arrestees); *Young v. City of Augusta*, 59 F.3d 1160, 1171-72 (11th Cir. 1995) (finding no "obvious need" to train jail employees "to recognize a need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed").

Defendant's argument is supported by the Eleventh Circuit's opinions requiring proof of a pattern of constitutional violations arising from jail suicides in the context of failure to train claims. *See Cagle*, 334 F.3d at 988-89 ("The plaintiffs cite no authority that supports the argument that the occurrence of two suicides and twenty-seven attempted suicides in the jail requires county officials to conclude that all prisoners of the Jefferson County Jail are substantially likely to attempt suicide." (quoting *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1540 (11th Cir. 1994)). If, as plaintiff contends, the need for more suicide prevention training qualified as one of the " obvious" categories where a constitutional violation could be made out without proof of a pattern of prior violations, the *Cagle* and *Tittle* Courts would not have needed to evaluate whether the plaintiffs in those cases had successfully shown a pattern of constitutional violations arising from jail suicides. The opinions in *Cagle* and *Tittle* clearly imply that the need to provide suicide prevention training is not so obvious as to bypass the requirement of proving a pattern of previous constitutional violations.

For the foregoing reasons, the court finds that, in order for plaintiff to prevail

on his § 1983 claim, plaintiff must allege the existence of a pattern of constitutional violations arising from jail suicides in the Decatur City Jail under circumstances that would constitute a constitutional violation. Plaintiff's failure to make such an allegation or to offer such proof is fatal to his complaint against the City.

### 2. State law wrongful death claim

Although the City argued in the memorandum in support of its motion to dismiss that plaintiff had failed to state a claim under the State of Alabama's wrongful death statute, Ala. Code § 6-5-410 (1975), defendant conceded in its reply brief that plaintiff's complaint is sufficient to state a vicarious liability wrongful death claim against the City, premised upon the alleged acts or omissions of defendants Harvey and Davis.[73]  For that reason, the City's motion to dismiss that claim will be denied.

## B.   Claims Against Defendants Collier, Gilliam, Matthews, and Harvey

### 1.    Plaintiff's claims under 42 U.S.C. § 1983

Defendants Collier, Gilliam, Matthews, Harvey, Latham, Brown, and Davis have been sued in their individual and official capacities.  "Official capacity suits generally represent only another way of pleading an action against the entity of which an officer is an agent." *Brandon v. Holt*, 469 U.S. 464, 472 n.21 (1985).  In other

---

[73] *See* doc. no. 44, at 13 ("The City essentially agrees with the plaintiff's observation in this regard and *concedes that the complaint is sufficient only to state a vicarious liability wrongful death claim against it* premised upon the alleged acts or omissions of defendants Harvey and Davis.") (emphasis supplied).

words, such actions are actually suits against the government entity that the officer represents. *See Monell v. Department of Social Services*, 436 U.S. 658, 690 n.55 (1978). Because the City of Decatur is a separately named defendant in this action, plaintiff's official capacity claims are redundant and, accordingly, will be dismissed.

The individual capacity claims against defendants Collier, Gilliam, and Matthews arise solely from their capacity as supervisors or alleged policymakers. The claims alleged against Sergeant Harvey arise, in part, from his role as a supervisor and, in part, as a jailer who directly participated in the events at issue.

Plaintiff's § 1983 claims against the supervisory defendants are contained in Counts II and III of the complaint. Plaintiff alleges in Count II that defendants Collier, Gilliam, Matthews, and Harvey failed to provide proper training, education, and policies for jailers in the Decatur City Jail.[74] Count III alleges that Collier, Gilliam, Matthews, and Harvey failed to properly supervise jailers in the Decatur City Jail.[75] The four supervisory defendants assert that the complaint fails to state a claim under § 1983 that is sufficient to overcome their assertion of the defense of qualified immunity.

Under the qualified immunity doctrine, government officials are not liable for

---

[74] *See* Doc. no. 1, at 17.

[75] *See id.* at 17-18.

civil damages if "their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. ___, 129 S.Ct. 808, 815 (2009). The qualified immunity doctrine protects law enforcement officials from liability under 42 U.S.C. § 1983, "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002).

Because qualified immunity is a defense not only to liability for monetary damages, but also from the burdens of litigation,[76] the Supreme Court and Eleventh Circuit often have stressed the importance of resolving immunity questions as early in the lawsuit as possible. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998). "Unless the plaintiff's allegations in the complaint state a claim of violation of clearly established

---

[76] *See, e.g.*, *Lassiter v. Alabama A. & M. University*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*) ("Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), and citing *Siegert v. Gilley*, 500 U.S. 226, 231-33 (1991) (holding that no discovery should be permitted if the qualified immunity question can end the case)).

law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Marsh v. Butler County*, 268 F.3d 1014, 1022-23 (11th Cir. 2001) (*en banc*) (quoting *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).

The Supreme Court has cautioned against identifying constitutional rights at a general level in the qualified immunity analysis and, instead, has required plaintiffs in a § 1983 case to point to case law that fairly warns the government actor of the unconstitutionality of the challenged conduct to overcome the defense of qualified immunity. *See Wilson v. Layne*, 526 U.S. 603, 604 (1999) (granting qualified immunity where plaintiff could not point to case law existing at the time of the incident which clearly established the rule of law upon which the plaintiff sought to rely). *See also Vinyard v. Wilson*, 311 F.3d 1340, 1351-1353 (11th Cir. 2002) (recognizing that, unless a constitutional provision directly prohibits the challenged conduct, or a case had previously held the challenged conduct to be unconstitutional under any circumstances, a § 1983 plaintiff must show that case law with "a very high degree of prior factual particularity" had previously determined the conduct to be unconstitutional before a government actor may be stripped of qualified immunity).

The standard for imposing liability in jail suicide cases within the Eleventh Circuit has been stated as follows: "In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under . . . the . . . Fourteenth Amendment, the

25

plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." *Cagle*, 334 F.3d at 986 (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989)) (omissions in original). "To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had '(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence.' " *Id.* at 987 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).  Under Eleventh Circuit precedent addressing liability for the suicide of pretrial detainees or convicted prisoners, deliberate indifference requires proof that the defendant deliberately disregarded "a *strong likelihood*, rather than a mere possibility that the self-infliction of harm will occur." *Id.* at 986 (emphasis in original) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1653 (11th Cir. 1990)).  "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Id.* (quoting *Tittle*, 10 F.3d at 1540).

With regard to the standard for liability of *supervisory officials and policymakers* in jail suicide cases, the parties agree that there are two separate and distinct lines of authority established by the Eleventh Circuit.[77]  The first line of cases

---

[77] *See* doc. no. 25 (Brief in Support of Motion to Dismiss by Collier, Gilliam, Matthews, and Harvey), at 12; doc. no. 34 (Plaintiff's Response to Motion to Dismiss by Collier, Gilliam, Matthews, and Harvey), at 5.

26

is exemplified by the Eleventh Circuit's decision in *Cook v. Sheriff of Monroe County*, 402 F.3d 1092 (11th Cir. 2005), where the Court required that a supervisory official not involved in the day-to-day activities involving the decedent must still have personal knowledge of that inmate's suicidal tendencies before liability may be imposed for failing to adopt adequate training and policies to prevent suicides. The *Cook* court rejected the plaintiff's argument that the sheriff's policies themselves constituted deliberate indifference to a potential class of jail suicides, and emphasized that actual subjective knowledge of the suicidal tendencies of the individual who later committed suicide was required. *Id.* The Court stated that, "under our precedent, the defendant must have had notice of the suicidal tendency of the individual whose rights are at issue in order to be held liable for the suicide of the individual." *Id.* at 1117.

The second line of cases is exemplified by the decision in *Cagle v. Sutherland*, 334 F.3d 980 (11th Cir. 2003), discussed in greater detail in Part III(A)(1), *supra*. In *Cagle*, the Eleventh Circuit held that liability on the part of a policymaker can exist if the policymaker was on notice of a number of prior instances of suicides but took no steps to alleviate the known risk. The *Cagle* court explained:

> As discussed in relation to the County's liability, no evidence existed that would indicate to policymakers, such as Sheriff Sutherland, that a strong likelihood of prisoner suicides existed in the Winston County Jail. The jail had no history of suicide [and] . . . [b]ecause no evidence shows that Sheriff Sutherland was aware of a strong risk of suicide at the jail, his

27

policy of only having one nighttime jailer cannot be deliberately indifferent to the risk.

*Id.* at 988-89.

Under either line of cases, defendants Collier, Gilliam, and Matthews have no supervisory liability.[78]  With regard to the standard announced in *Cook*, plaintiff does not allege that any of the three purely supervisory defendants had any knowledge of any suicidal threats on the part of plaintiff's decedent, Travoris Hood.  These defendants are also entitled to qualified immunity under the standard announced in *Cagle*.  As discussed with regard to the claims against the City of Decatur, *see* Part III (A)(1) *supra*, the complaint contains no allegation of any prior history of suicides in the Decatur City Jail.

Defendants further argue, and this court also agrees, that the Eleventh Circuit's opinions in *Cagle* and *Cook* provide differing standards for supervisory liability in a § 1983 jail suicide cases, such that it cannot be said that the law was "clearly established" on the date of the Hood's suicide.[79]  Because there was no clearly established standard for liability on the part of jail supervisors and policymakers at the time of Hood's suicide, and in light of the fact that the complaint fails to allege facts

---

[78] The liability of Sergeant Harvey, other than as a supervisor, will be discussed in Part C, *infra*.

[79] *See* doc. no. 25 (Brief in Support of Motion to Dismiss by Collier, Gilliam, Matthews, and Harvey), at 18.

to show that the supervisory defendants violated either standard, the § 1983 claims against defendants Collier, Gilliam, and Matthews are due to be dismissed.  The claims against Sergeant Harvey as a supervisory defendant, which are asserted in Counts II and III of the complaint, also are due to be dismissed.  However, in light of Sergeant Harvey's unique position, both as a supervisor and as a jailer directly involved with events at issue in this case, plaintiff's claims against Sergeant Harvey as a jailer merit further discussion below.

### 2.  State law wrongful death claims

In Count V of the complaint, plaintiff states a wrongful death claim under Alabama Code § 6-5-410 (1975) against all defendants, alleging that defendants' wrongful acts or failures to act proximately caused Hood's death.  The supervisory defendants argue that plaintiff's wrongful death claims against them should be dismissed on the grounds that they are entitled to discretionary function immunity under Alabama Code § 6-5-338(a) (1975), and that the claims asserted against them do not exist under Alabama law.

The Alabama Supreme Court has considered the liability of supervisory employees for suicides in municipal jails arising out of claims of deficiencies in the training and supervision of jail employees and the establishment of policies at the jail. *See Howard v. City of Atmore*, 887 So. 2d 201 (Ala. 2003).  In *Howard*, the plaintiff

29

sought to impose liability against a city police chief for the suicide of an inmate on the basis that the he "negligently or wantonly failed to implement and/or enforce procedures relating to the identification and handling of potentially suicidal inmates," and "negligently or wantonly failed to train [jail officers] in the identification and handling of potentially suicidal inmates." *Id.* at 209. Like the supervisory defendants in this case, the police chief in *Howard* asserted that he was entitled to peace officer immunity under Alabama Code§ 6-5-338(a) (1975).[80]  *Id.* at 2-3. The *Howard* Court noted that entitlement of a public officer to discretionary function immunity is governed by the restated formulation of state-agent immunity[81] developed by the

---

[80] The statute cited in text reads as follows:

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a) (1975).

[81] Although the Supreme Court refers to the doctrine as "state agent" immunity, it is well settled that the immunity doctrine apply with equal force to city police officers. *Shows v. Morgan*, 40 F. Supp. 2d 1345, 1364 (M.D. Ala. 1999) (noting that state agent or discretionary function immunity "has been extended to city police officers" by Ala. Code § 6-5-338(a)).

Alabama Supreme Court in *Ex Parte Cranman*, 792 So. 2d 392 (Ala. 2000).[82]  The

Supreme Court in *Cranman* articulated the standard for state-agent immunity as

follows:

> A State agent *shall* be immune from civil liability in his or her
> personal capacity when the conduct made the basis of the claim against
> the agent is based upon the agent's
>
> > (1)   formulating plans policies or designs;
> >
> > (2)   *exercising his or her judgment in the administration of a
> > department or agency of government*, including, but not
> > limited to, examples such as:
> >
> > > (a)   making administrative adjudication;
> > >
> > > (b)   *allocating resources*;
> > >
> > > (c)   negotiating contracts;
> > >
> > > (d)   *hiring, firing, transferring, assigning, or supervising
> > > personnel* . . .

*Howard*, 887 So. 2d at 204-05 (quoting *Cranman*, 792 So. 2d at 405).

To determine whether a police officer is entitled to discretionary function

immunity, a burden-shifting analysis is employed.  The first step in the analysis is to

determine whether the police officer whose conduct is challenged was engaged in the

performance of a discretionary function at the time the alleged tort occurred.  *See*

---

[82] *Cranman* was a plurality decision which was adopted by a majority of the Alabama
Supreme Court in *Ex Parte Butts*, 775 So. 2d 173, 178 (Ala. 2000), as the restatement of the law of
immunity for state agents in Alabama.

*Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.9 (11th Cir. 2001); *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998).  If the officer was performing a discretionary act, the burden shifts to the plaintiff who, in order to deny the officer immunity, must demonstrate that the officer acted willfully, with malice, or in bad faith.  *See Sheth*, 145 F.3d at 1239.  "Acts of such nature are not considered [by Alabama law] to be discretionary. . . ."  *Wright v. Wynn*, 682 So. 2d 1, 2 (Ala. 1996); *see also Couch v. City of Sheffield*, 708 So. 2d 144, 153 (Ala. 1998) (holding that discretionary function immunity insulates law enforcement officers from tort liability, "unless the officer's conduct is so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith").

The *Howard* Court characterized the plaintiff's claims against the police chief as follows: "Simply stated, the claims against Chief McKinley allege faulty training and supervision."  *Howard*, 887 So. 2d at 209.  The Court held that the actions and omissions allegedly giving rise to liability on the part of the Chief clearly fell within Categories 2(b) and (d) of the *Cranman* listing of discretionary functions that are protected by the state-agent immunity rule.  The Court held that, because the plaintiff had made no showing that the Chief had acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority, he was entitled to discretionary function immunity.

Similarly, in this case, plaintiff alleges that the supervisory defendants failed to

properly train and supervise corrections officers in suicide prevention at the Decatur City Jail.  These alleged omissions clearly constitute discretionary actions that are protected by the discretionary function immunity rule.  As in *Howard*, there is no allegation in this case that in discharging their functions, the supervisory defendants acted "willfully, maliciously, fraudulently, in bad faith or beyond [their] authority." *See Howard*, 887 So. 2d at 210.  Therefore, the supervisory defendants are entitled to discretionary function immunity under Alabama Code § 6-5-338(a) (1975), and the state law wrongful death claims against defendants Collier, Gilliam, and Matthews will be dismissed.

Having said that, and even though Sergeant Harvey is entitled to discretionary immunity for any alleged wrongful actions or omissions that he may have made in his role as a supervisory defendant, that holding does not foreclose plaintiff's claim against him with regard to his function as a jailer.  Defendants do not seek dismissal of the state law claims against the jailers.  Therefore, the state law claim against Sergeant Harvey for wrongful death will remain pending.

## C.    Claims Against Defendants Harvey, Latham, Brown, and Davis

Plaintiff's § 1983 claims against Sergeant Harvey and Officer Latham, Brown, and Davis are contained in Count I of plaintiff's complaint, which alleges that those defendants failed to take proper suicide prevention precautions that would have

prevented Hood from harming himself.[83]  Like the supervisory defendants, Sergeant Harvey, and Officers Latham, Brown, and Davis argue that the complaint fails to state a claim under § 1983 that is sufficient to overcome their assertion of the defense of qualified immunity.  Defendants emphasize that plaintiff cannot meet the heightened pleading requirements applicable to cases brought under § 1983 when the defense of qualified immunity has been asserted.[84]

Unlike the standard of liability applicable to supervisory defendants in the context of jail suicides, however, the standard for line officers is clearly established in the Eleventh Circuit.  As discussed in Parts III (A) and (B), *supra*, the Eleventh Circuit has held that, to prevail under § 1983 in a prisoner suicide case, a plaintiff must show that the jail official displayed "deliberate indifference" to the decedent's act of taking his own life.  *Cagle*, 334 F.3d at 986.  To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had "(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence." *Id.* at 987 (quoting *McElligott*, 182 F.3d at 1255).  Deliberate indifference requires that the defendant deliberately disregard "a strong likelihood, rather than a mere possibility that the self-infliction of harm will

---

[83] *See* doc. no. 1, at 16.

[84] *See* doc. no. 27 (Brief in Support of Motion to Dismiss by Harvey, Latham, Brown, and Davis), at 9-11.

34

occur." *Id.* at 986  (emphasis in original) (quoting *Popham v. City of Talladega*, 908 F.2d at 1653).

Defendants argue that there are no facts alleged in the complaint that would give rise to the conclusion that the officers were aware that there was "a strong likelihood rather than a mere possibility" that Hood might take his life.  The complaint states in a conclusory fashion that defendants "Harvey, Latham, Brown, and Davis had subjective knowledge that Hood was deeply disturbed and that he might attempt to seriously harm himself or commit suicide."  However, such a conclusory allegation is not sufficient to meet the heightened pleading standard applicable to a § 1983 claim. *See Gonzalez*, 325 F.3d at 1235.

Although the complaint alleges that Hood specifically told Sergeant Harvey and Officer Davis that he would commit suicide if he was forced to stay in the three-man cell, the complaint makes no allegation "by specific facts" that this threat was ever communicated to Officers Latham and Brown.  Without that specific allegation of fact, plaintiff cannot maintain a claim against defendants Latham and Brown under the heightened pleading standard, because he cannot show that those defendants had subjective knowledge of a risk of serious harm.  On the other hand, with regard to the claims against Sergeant Harvey and Officer Davis, the court finds that plaintiff has alleged sufficient facts from which it can be inferred that there was a "strong

likelihood" that Hood would commit suicide.   Therefore, plaintiff has met the heightened pleading standard and has overcome the defense of qualified immunity asserted by Sergeant Harvey and Officer Davis.

## IV.  CONCLUSION

For all of the foregoing reasons, the motion to dismiss filed by the City of Decatur (doc. no. 22) will be granted as to plaintiff's § 1983 claim, and denied as to plaintiff's state law claim for wrongful death.   The motion to dismiss filed by defendants Kenneth Collier, Joel Gilliam, Christopher Matthews, and Michael Harvey (doc. no. 24) will be granted as to both plaintiff's § 1983 claim and the state law claims against those defendants.   The motion to dismiss filed by defendants Michael Harvey, Sharon Latham, Eric Brown, and Vernon Davis (doc. no. 26) will be granted as to defendants Sharon Latham and Eric Brown, but denied as to defendants Michael Harvey and Vernon Davis.

An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 28th day of July, 2010.

United States District Judge

36